UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THE CHESAPEAKE LIFE INSURANCE COMPANY,

    Plaintiff,

v.                                                            Case No. 18-C-643

GATHEL D. PARKER, *et al.*,

    Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

The Chesapeake Life Insurance Company commenced this interpleader action in the United States District Court for the Southern District of Mississippi seeking a judicial determination of the beneficiary of the proceeds from the policy it issued on the life of Daniel Parker. Venue was transferred to this court pursuant to 28 U.S.C. § 1404(a). ECF No. 26. Prior to transferring the case, the district court in Mississippi granted Chesapeake's motion to deposit $19,658.00 into the court's registry and dismissed Chesapeake from the case. ECF Nos. 15, 17, 25. The claimants to the proceeds include Daniel's ex-wife Gathel Parker, his sister Connie Skenandore and his daughters Shana Parker and Jessica Parker, all four of whom are representing themselves. Gathel Parker is a citizen of Mississippi, and Connie Skenandore, Shana Parker, and Jessica Parker are all citizens of Wisconsin. This court has jurisdiction over this matter under 28 U.S.C. § 1335. A trial to the Court was held on August 30, 2018. Based on the evidence presented by the parties, I make the following findings of fact and conclusions of law.

# FINDINGS OF FACT

1. Daniel Parker procured from Chesapeake a $20,000.00 life insurance policy with a December 5, 2008 effective date. ECF No. 9-1 at 8–9. At that time, Daniel[1] designated his wife Gathel Parker, with whom he lived in Mississippi, as the primary beneficiary and his daughter Jessica Parker, who lives in Green Bay, as the contingent beneficiary. Ex. 1.

2. In 2014, Daniel moved back to Green Bay, where he lived until his death on October 6, 2016. Gathel continued to live in Mississippi. On July 21, 2015, Connie Skenandore, Daniel's sister who was then living with him, caused to be sent to Chesapeake a Beneficiary Change Request form designating Connie as the primary beneficiary and her husband Phillip Skenandore as the contingent beneficiary. ECF No. 9-3; Ex. 2.

3. Although Daniel's signature appears on the second page of the Change of Beneficiary form, Connie actually signed the form using Daniel's name. Connie admitted as much after Robin Williams, a document examiner, testified that in his opinion, after comparing the signature on the form with known samples of Daniel's actual signature, "it was highly probable" that the signature on the Change of Beneficiary form, Ex. 2, was not written by the same person who signed the known samples.

4. Connie testified that she signed Daniel's name on the Change of Beneficiary form, Ex. 2, at Daniel's request because his arm was broken at the time and he wanted her to have the proceeds of the policy. I do not find Connie's testimony credible for several reasons. First, Connie never admitted she had signed the form until after Mr. Williams testified that the signature was not Daniel's

---

[1] Because the decedent and three of the four parties have the same last name, the court will use first names throughout this decision.

and that it appeared more likely to be Connie's handwriting. In signing the form, she did not indicate that she was signing on behalf of Daniel. She simply signed Daniel's name. And while it appears Daniel had a brace on his arm at some time, there was no evidence offered to substantiate Connie's claim that he was unable to sign his name. The known samples on which Mr. Williams relied include signatures with dates both shortly before and after the date on which the Change of Beneficiary form was signed. Ex. 6. There was also no testimony from the "disinterested witness" who purportedly witnessed the signing of the document. Finally, it appears from Gathel's testimony that Connie was taking advantage of Daniel and cutting off contact with others as Daniel's health declined. I therefore find that Connie signed Daniel's name to the Change of Beneficiary form without authorization or permission of Daniel.

5.  On January 16, 2016, a judgment of divorce terminating the marriage of Daniel and Gathel was entered by the Oneida Nation Family Court. Ex. 4. According to the divorce judgment, Daniel appeared in person before the Oneida Family Court, and Gathel appeared by telephone. Under the terms of the divorce, both parties were permitted to change their beneficiaries on their insurance and other documents/instruments.

6.  Gathel testified that the divorce was not valid because Daniel was intoxicated at the time and Connie was telling him what to say. Gathel testified that she told the judge Daniel was intoxicated, but the judge told her it wasn't for her to say; that "he was the one doing the divorce, so be it." Connie admitted she was present during the divorce hearing, but she only repeated what the judge was saying because Daniel was hard of hearing. Gathel disputed this testimony, stating that Daniel had a state-of-the-art hearing aid.

7.  Daniel died on October 6, 2016, in Green Bay, Wisconsin. Prior to his death, he was in declining health for several years.

## CONCLUSIONS OF LAW

8.  For the reasons stated in the Court's decision denying the parties' motions for summary judgment, the substantive law of the forum state, namely Wisconsin, applies.

9.  The Change of Beneficiary form submitted by Connie, which names her and her husband as primary and contingent beneficiaries under the Chesapeake policy is void and of no effect. This follows because it was not signed by Daniel or with his authorization and consent. *See State Bank of Drummond v. Christopherson*, 93 Wis. 2d 148, 156, 286 N.W.2d 547 (1980).

10. The divorce judgment entered by the Oneida Family Court was received into evidence without objection as authentic, although Gathel claims that Daniel was drunk at the time of the hearing and incapable of participating in the proceeding. Although Section 806.245 of the Wisconsin Statutes sets forth numerous conditions that are to be met before a state court gives full faith and credit to a tribal court judgment, the trial was held in federal court. In federal courts, the Federal Rules of Evidence apply. *See Levitt v. H. J. Jeffries, Inc.*, 517 F.2d 523, 525 (7th Cir. 1975) ("A United States District Court sitting in a diversity case is not bound by Illinois law, but, rather, looks to Rule 43(a) F.R.Civ.P., which speaks to the admissibility of evidence in the United States Courts.").

11. In federal courts, recognition of tribal court judgments is governed by principles of comity, not the "full faith and credit" clause of the United States Constitution. *Wilson v. Marchington*, 127 F.3d 805, 808–10 (9th Cir. 1997). "'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895). It is instead "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to

4

international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Id.* at 164. In *Wilson*, the Court held that "as a general principle, federal courts should recognize and enforce tribal judgments." 127 F.3d at 810; *see also Burrell v. Armijo*, 456 F.3d 1159, 1168 (10th Cir. 2006) ("But '[u]nless the district court finds the tribal court lacked jurisdiction or withholds comity for some other valid reason, it must enforce the tribal court judgment without reconsidering issues decided by the tribal court.'") (quoting *AT & T Corp. v. Coeur D'Alene Tribe*, 295 F.3d 899, 905 (9th Cir. 2002)).

12. Notwithstanding the foregoing, federal courts must not recognize or enforce tribal court judgments if either (1) the tribal court did not have both personal and subject matter jurisdiction; or (2) the defendant was not afforded due process. *Wilson*, 127 F.3d at 810. In addition, a federal court may in the exercise of its discretion decline to recognize and enforce a tribal judgment under any of the following circumstances:

> (1) the judgment was obtained by fraud;
>
> (2) the judgment conflicts with another final judgment that is entitled to recognition;
>
> (3) the judgment is inconsistent with the parties' contractual choice of forum; or
>
> (4) recognition of the judgment, or the cause of action upon which it is based, is against the public policy of the United States or the forum state in which recognition of the judgment is sought.

*Id.*

13. Finally, application of these principles to tribal court judgments requires consideration of the unique relationship between the federal government and Indian tribes:

> Federal courts must also be careful to respect tribal jurisprudence along with the special customs and practical limitations of tribal court systems. Extending comity to tribal judgments is not an invitation for the federal courts to exercise unnecessary

5

> judicial paternalism in derogation of tribal self-governance. However, the tribal court proceedings must afford the defendant the basic tenets of due process or the judgment will not be recognized by the United States.

*Id.* at 811.

14. The official website for the Oneida Nation of Wisconsin, a federally recognized Indian tribe, of which I take judicial notice pursuant to Fed. R. Evid. 201(b); *see also Laborers' Pension Fund v. Blackmore Sewer Construction, Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from official website of the FDIC), states that "the Oneida Family Court is a court convened to decide matters and make orders in relation to family law, such as divorce, child support, and custody of children." The website further notes that the court is tasked with:

- Providing for the administration of law and justice;

- Exercising the inherent power to apply and enforce Oneida law as it pertains to the family and/or children;

- Providing a knowledgeable, fair, and impartial forum for the resolution of all family law matters; and

- Supporting a separation of Tribal governmental powers.

*Family Court*, ONEIDA, https://oneida-nsn.gov/government/judiciary/family-court/ (last visited Aug 31, 2018). Parties dissatisfied with a decision of the Oneida Family Court can appeal to the Oneida Court of Appeals, a "branch of the Oneida Judiciary with the responsibility and authority to review decisions of the Oneida Trial and Family Courts, and original hearing bodies, such as the Personnel Commission, Oneida Land Commission, as well as other deliberative bodies of the Nation." *Id.*

15. Gathel submitted to the jurisdiction of the tribal court by appearing by telephone. Although she claims that Daniel was drunk and incapable of participating in the proceeding, the judge before whom the hearing implicitly held otherwise, since he proceeded with the hearing, granted the parties

6

a divorce, and entered judgment resolving the issues of maintenance, property division and allocation of debt. Ex. 4. It is also clear from the Divorce Judgment that Gathel was provided an opportunity to be heard. Her request for maintenance was denied, but in lieu of maintenance, the court assigned all marital debt placed on the record at the final hearing to Daniel. The Divorce Judgment also gave each party the right to change the beneficiaries of their insurance policies. Ex. 4 at 3. It is also significant that Gathel did not appeal the divorce judgment to the Oneida Court of Appeals. *See Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 16–17 (1987) (noting the need for non-Indians to exhaust tribal remedies in civil cases before seeking review in federal court).

16. Based on the foregoing facts and applying the principles of comity, I conclude that the Divorce Judgment entered by the Oneida Family Court should be recognized. As noted above, Gathel submitted to the jurisdiction of the Family Court by appearing and participating in the final hearing. She was given notice and an opportunity to be heard. Although Gathel claims that Daniel was intoxicated, she does not claim that she was denied due process in the Family Court proceeding, and does not appear to have taken any action to challenge the authority of the tribal court to grant the divorce until this case arose over the proceeds of a life insurance policy.

17. Under Wisconsin law, a divorce judgment presumptively revokes any revocable beneficiary designation of the former spouse on a life insurance policy. Wis. Stat. § 854.15. An exception exists if the insured had a contrary intent, § 854.15(5)(bm). Although Gathel contends that Daniel did not want the divorce, she has offered no evidence, other than her own belief, that he did not. Daniel moved to Green Bay in 2014 by himself to be with his family, and Gathel remained in Mississippi. They were separated for two years before his death. Gathel has not offered evidence sufficient to rebut the presumption that arises under Wisconsin law that a divorce revokes any revocable

7

beneficiary designation of the former spouse on a life insurance policy. Accordingly, the divorce entered by the Oneida Family Court effectively revoked the designation of Gathel Parker as the primary beneficiary of the Chesapeake Life Insurance Policy.

18. It follows that the proceeds of the Chesapeake Life Insurance Policy previously deposited into the court's registry, together with interest thereon, must be paid to Daniel's daughter Jessica Parker, the contingent beneficiary under the original beneficiary designation. Ex. 1.

## ORDER FOR JUDGMENT

Based upon the above Findings of Fact and Conclusions of Law, the Court hereby determines that Defendant Jessica D. Parker is the lawful beneficiary under the Chesapeake Life Insurance Policy issued to Daniel Parker and all other claims to the proceeds are dismissed. The Clerk is directed to enter judgment for declaratory relief in favor of Jessica D. Parker forthwith. If no party files an appeal within thirty (30) days of entry of judgment, the Clerk is directed to pay over the proceeds to Jessica D. Parker. In the event a party files a notice of appeal, payment of the proceeds will await the outcome.

**SO ORDERED** this 31st day of August, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
